THE PEOPLE ex rel. AUGUSTUS T. MORRIS et al., Appellants, v. THE BOARD OF SUPERVISORS OF RICHMOND COUNTY, Respondent.

Under the compact made in 1833 between this State and New Jersey, fixing the boundary line between the two States, by which the boundary south of Staten Island is defined as a line passing through the middle of the waters "of Raritan bay to the main sea," the whole body of water from the mouth of the Raritan river to the ocean, including what is now known as the Lower bay and Raritan bay was designated as "Raritan bay."

The middle of Raritan bay, as thus designated, where it joins the main ocean, is the center of a line from Sandy Hook to Coney Island; at any other point it is the shortest line between the New Jersey coast and Staten Island.

Accordingly *held*, where a vessel was sunk in the waters of the Lower bay, at a point 1,080 feet southerly of the center of a line drawn from the northerly end of Sandy Hook, the nearest land on the New Jersey shore, to the nearest land on the Staten Island shore, that the wreck was within the territorial limits of New Jersey; and that the expense of removing the same was not chargeable upon the county of Richmond, under the act of 1860 (chap. 522, Laws of 1860), providing for the removal of obstructions to navigation in the harbor of New York.

(Argued March 28, 1878; decided April 23, 1878.)

APPEAL from order of the General Term of the Supreme Court in the second judicial department, reversing a judgment in favor of relators, entered upon the report of a

referee directing the issuing of a peremptory mandamus, requiring defendant to audit, allow and pay to relators, the amount agreed to be paid to them under and by a contract between them and the pilot commissioners of the port of New York, for removing a sunken vessel from the Lower bay.

The further facts appear sufficiently in the opinion.

*Richard H. Huntley*, for appellants.   The wreck was within the jurisdiction of the county of Richmond, and the expense of the removal was properly chargeable on that county.   (1 R. S. [6th ed.], 124 [m. p.], 65; *People* v. *Cent. R. R. Co. of N. J.*, 42 N. Y., 283, 292, 312, 313.)

*Tompkins Westervelt*, for respondent.   The wreck was not within the limits of Richmond county but within the territorial limits of New Jersey.   (1 R. S., part 1, chap. 11, § 2, subd. 4; Laws 1834, p. 9.)

Andrews, J.   The expense incurred by the board of commissioners of pilots, in the removal of a sunken vessel or other obstruction to the navigation of the waters or harbor of New York, is by chapter 522 of the Laws of 1860 made a charge upon the county within whose jurisdiction such vessel or obstruction may be.

The principal question in this case is whether the locality of the wreck, the expense of removing which is the subject of this action, was within the territorial limits of the county of Richmond.   There is no dispute as to the precise point where the wreck lay.   That point was in the waters of the lower bay, between Staten Island and New Jersey — near the westerly limits of the main ship channel, and northwesterly from the northerly end of Sandy Hook, the nearest land on the New Jersey shore, and ten hundred and eighty feet southerly of the centre of a line passing through the locality of the wreck, connecting Sandy Hook with the nearest land on the Staten Island shore.

The county of Richmond is declared by statute to contain

Staten Island, Shelter Island, and the Islands of Meadow
on the west side of Staten Island, "and all the waters and
lands under water of this State around the same, situate to
the southward and westward of the main channel of the bay
and harbor of New York, as far as the bounds of this State
extend." (1 Rev. Stat., part 1, chap. 1, sec. 2, sub. 4.) By
this description the middle of the main channel is the eastern
boundary of the county; but the southern boundary is left
undefined, except by reference to the boundary of the State
with which it is made coincident. To determine what waters
between Staten Island and New Jersey are within the
territorial limits of the county, the boundary of the State
between Staten Island and New Jersey must be ascertained.

The boundary of the State at this point was defined in the
Revised Statutes as extending from a designated point on
the west side of Hudson's river "southerly along the west
shore, at low-water mark of Hudson's river, of the kill Van
Kull, of the sound between Staten Island and New Jersey,
and of Raritan bay to Sandy Hook, and then to the place
of beginning, in such manner as to include Staten Island,
etc., and all the islands and waters in the bay of New York,
and within the bounds above described." (1 Rev. Stat.,
part 1, chap. 1, title 1, sec. 1.)

This description includes all the waters between Staten
Island and low-water mark on the New Jersey shore, and
as the wreck was within these waters there could be no ques-
tion that the locality was within the limits of Richmond
county, except for the change in the boundary line between
New York and New Jersey made by the treaty or compact
entered into between commissioners appointed by the respec-
tive States in 1833, and subsequently ratified by the legis-
latures of the two States and by Congress. The first article
of the compact is as follows: "Article first. The boundary
line between the two States of New York and New Jersey,
from a point in the middle of Hudson river, opposite the
point on the west shore thereof, in the forty-first degree of
north latitude, as heretofore ascertained and marked, to the

main sea, shall be the middle of the said river, of the bay of New York, of the waters between Staten Island and New Jersey, and of Raritan bay to the main sea, except as hereinafter otherwise particularly mentioned." The exception has no bearing upon the question here, and may be left out of view. The line defined by this article extends eastwardly to the " main sea." (Chap. 8, Laws of 1834.) The learned referee assumed and the counsel for both parties acquiesced in the view that this treaty was intended to define the entire boundary between the two States, and that the words " main sea" were intended to designate that part of the sea flowing outside of Sandy Hook, as distinguished from that part included within Sandy Hook and Coney Island, constituting what is known as the waters of the bay and harbor of New York. The common law definition of the *main* sea was that part of the sea lying outside of the *terræ fauces* or points on the opposite shore sufficiently near to enable persons standing on one shore to distinctly see and discern with the naked eye what is doing on the opposite shore. The water within the *terræ fauces*, although properly called the sea or an arm of the sea, is not the *main* sea within the common law definition. (Fitz. Abridg. Corone., 399; 8 Edw., 2; De Jure Maris. Harg. Tracts, ch. 4, p. 10; 2 East P. C., ch. 17, § 10, p. 804; *U. S.* v. *Grush*, 5 Mason, 290.)

The definition of the *main* sea seems to have been made by the common law judges in construing the ancient statutes (13 Rich. II., chap. 5, and 15 id., chap. 3), the first of which enacts : " That the admirals and their deputies shall not meddle from henceforth with anything done within the realm, but only such things done *upon the sea*," and the second : " That of all manner of contracts, pleas, etc., and of all other things done or arising *within the bodies of the counties*, as well by land as by water, etc., the admiral's court shall have no manner of cognizance, power nor jurisdiction," etc.

The boundaries of the counties in England were not defined by statute, and the common law courts in construing these statutes (13 and 15 Rich. II.), held, that such boundaries

included such parts of the sea as were within the *terræ fauces ;* and that only that part without was the *sea*, or the *main* sea, over which admiralty had jurisdiction. (See *De Lovio* v. *Boit*, 2 Gall., 398 and cases cited ; *Waring* v. *Clarke*, 5 How. U. S., 441.)  If the words *main sea*, in the compact between New York and New Jersey were used in the strict common law sense, the boundary between the two States at the point where the wreck was located was not defined.  The nearest distance from shore to shore at this point, as we judge from an inspection of the maps, is eight or ten miles, and the true *terræ fauces* would probably carry the main sea, according to the common law definition, as far west as the line drawn from Conaskonk point on the New Jersey shore, to Seguine point, on Staten Island.  If, in construing the compact between the States, this should be taken as the line dividing the *main sea* from the waters or arms of the sea, it would follow that only a small portion of the boundary line between Staten Island and the New Jersey shore was defined by the treaty, and it would leave the boundary of this State east of this line, as it was defined in the revision of 1830. This result would make the locality of the wreck within Richmond county.  But we express no opinion upon the construction of the words *main sea*, used in the compact, and in deciding this case shall accept the admission of both parties, that they refer to the open uninclosed ocean, divided from the waters of the bay of New York by a line drawn from Sandy Hook to the opposite shore at Coney Island.

The boundary south of Staten Island is defined in the compact as a line passing through the middle of the waters " of Raritan bay to the main sea."  There was no evidence given on the trial as to how far Raritan bay, as it was known in 1833, extended towards the main sea.  The chart of the coast survey, made twenty years subsequent to 1833, represents a bay, called on the chart the Lower bay, as lying between Raritan bay and the main sea.  Both bays constitute one continuous body of water, not separated by any natural features or divisions.  The learned referee assumed, in

deciding the case, that Raritan bay in 1833 extended eastward only to the Lower bay, as represented on the chart, and found the middle line mentioned as the boundary, to be a line drawn through the center of Raritan bay to the west line of the Lower bay, and protracted from thence through the Lower bay to the main sea at Sandy Hook. This line leaves the locality of the wreck a short distance north of the line. But it seems to us that the General Term was right in saying that the description calls for but one bay from the mouth of the Raritan river to the ocean. The whole body of water lying west of the main sea, including what is now known as the Lower bay, and Raritan bay was designated in the description as Raritan bay. This view is strengthened by the description in the boundary of the State in the statute of 1830, which runs the boundary south of Staten Island, along the west shore " of the sound between Staten Island and New Jersey, *and of Raritan bay to Sandy Hook*," showing that Raritan bay was then understood to extend to Sandy Hook.

The locality of the wreck, as has been stated, was nearer to the New Jersey shore than to Staten Island. The middle of Raritan bay, where it joins the main ocean, is the centre of a line from Sandy Hook to Coney Island, and at any other point it is, we think, the centre of the shortest line between the New Jersey coast and Staten Island, and this leaves the wreck on the New Jersey side of the dividing line between the two States.

There is no precedent, so far as I know, to guide us in determining the question presented. The shore lines of Staten Island and New Jersey are not parallel, and the outline of the New Jersey coast is very irregular. I do not see how, in locating the boundary, we can reject Sandy Hook as an element in the question, and I see no other way of ascertaining where is the middle point of the waters between the two States, than the one suggested.

The order should be affirmed.

All concur, except Rapallo, J., absent.

Order affirmed, and judgment absolute against appellants.